## UNITED STATES BANKRUTPCY COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

**RE: GREGORY AND RONDA**                          **Case No. 4:09-bk-11116**
**ANDREWS**                                                          **Chapter 7**

**RANDY AND RENEE WATSON,**                          **PLAINTIFFS**

**v.**                                          **A.P. NO. 4:09-ap-01150**

**GREGORY AND RONDA**                          **DEFENDANTS**
**ANDREWS**

## MEMORANDUM OPINION DENYING DEBTORS' DISCHARGE

This matter is before the Court on the *Defendants' Motion to Amend Judgment or for New Trial* (the **"Motion to Amend,"** Docket #21 and, as amended, Docket #23), for which the Defendant-Debtors Greg and Ronda Andrews (the **"Debtors,"** or, individually, **"Greg"** and **"Ronda," "Greg Andrews,"** and **"Ronda Andrews"**) filed a *Brief in Support* (Docket #22). This matter is a core proceeding, as defined by 28 U.S.C. § 157(b)(2)(J), over which this Court has jurisdiction pursuant to 28 U.S.C. § 1334(b).

### PROCEDURAL BACKGROUND

The Debtors filed their voluntary bankruptcy petition (the **"Petition"**) on February 19, 2009. The meeting of creditors was scheduled for April 14, 2009, and on April 24, 2009, the Trustee made a docket entry indicating that the meeting of creditors had been held and concluded (4:09-bk-11116, Docket #21). On May 15, 2009, Debtors amended the Petition (the **"First Amended Petition"**) to disclose a tax refund, for which they claimed an exemption. On June 19, 2009, Randy and Renee Watson (the **"Creditors"**)

1

filed the complaint commencing this adversary proceeding (the **"Complaint"**). The Complaint alleges that the Debtors knowingly and fraudulently made false oaths in filing the Petition. It further alleges that, with the intent to hinder, delay, or defraud creditors, the Debtors transferred and concealed their property within one year of the Petition. The Complaint requests that the Debtors' discharge be denied pursuant to 11 U.S.C. § 727(a)(2)(A) and (a)(4)(A).

On July 21, 2009, the Debtors filed an answer (the **"Answer,"** Docket # 7) in which they denied every material allegation in the Complaint. On October 23, 2009, the Debtors filed another amended petition (the **"Second Amended Petition,"**) in which they disclosed information about transfers and other allegations made in the Complaint. Specifically, the changes made in the Second Amended Petition were the following additions:

In **Schedule B (Personal Property)**, listed as belonging only to Greg Andrews, and claimed as fully exempt in **Schedule C (Exemptions)**:

1. A fire suit valued at $50;
2. A golf cart valued at $2500;
3. Miscellaneous tools valued at $100; and
4. A nitrous pumping station valued at $300.

(These items are collectively referred to as the **"Personal Property**.**"**)

In the **Statement of Financial Affairs, Question 10 (Other Transfers)**:

1. A shop building sold to Lester Miller, Jr. for $4000 in November 2008;
2. An air compressor sold to Jeff Andrews (Debtor's brother) for $400 in December 2008;
3. A wire welder sold to Jeff Andrews (Debtor's brother) for $400 in January 2009;

2

    4. A 1995 Harley Davidson exchanged with Pete Holland for a 4-wheeler in June 2008; and

    5. A 4-wheeler sold to Marcus Andrews (Debtor's brother) for $3000 in June 2008.

(These items are collectively referred to as the **"Transfers**.**"**)

On October 27, 2009, the Court held a trial (the **"Trial"**). During the Trial, the Court heard testimony from six individuals: Steve Wallin, a long-time acquaintance of the Debtors and a drag racing expert; Tony Sides, long-time acquaintance of the Debtors; Ronda Andrews, Debtor; Greg Andrews, Debtor; Randy Watson, Plaintiff; and Brian Andrews, brother of Greg Andrews.

On February 2, 2010, the Court held a telephonic hearing, delivering a lengthy oral opinion (the **"Oral Opinion"**) denying the Debtors' discharge. In the Oral Opinion, the Court made factual findings that were the basis of the ruling. On February 19, 2010, the Debtors filed the Motion to Amend asserting that the Court had made findings or conclusions in the Oral Opinion that were not supported by the evidence presented at the Trial. After considering the Motion to Amend, the Court concluded that mistakes were made and determined that it would be necessary to review the evidence in this case *de novo*. Consequently, the Court withdrew the Oral Opinion in its *Order Granting Motion to Amend in Part, Denying Motion for New Trial and Withdrawing Oral Ruling* (the **"Withdrawal Order,"** Docket # 25).

3

## AMENDED AND CORRECTED FINDINGS OF FACT

Given the grave consequences of the denial of a debtor's discharge and having acknowledged previous errors, the Court listened to the Trial and reviewed all evidence a second time. The Court makes the following findings of fact:

1.      The Debtors have been married for 13 years. Greg Andrews has raced cars since before that time. Drag racing has long been Greg's great passion in life.

2.      Some time in the early 1990s, Greg and his brother, Brian Andrews, built a drag racing car, called the "Big Nasty" (the **"Race Car"**), from a chassis.

3.      Greg is undisputedly the driver of the Race Car. He has raced it at public events, appeared in television interviews with it, represented it belonged to him, worked on it, maintained it, named it, stored it, painted extensive detailed designs on it, and held himself out as its owner to both the Creditors and the general public.[1]

4.      At races, Greg sold T-shirts. One of these T-shirts was introduced into evidence as Plaintiffs' Exhibit #8. The words "Greg Andrews" appear on the T-shirt, above the picture of the Race Car. Underneath the picture, the T-shirt reads "Outlaw Door Slammer." Testimony indicated Greg is a member of a drag-racing club called the "Dixie Door Slammers." The T-shirt makes no reference to any other person or business. The back of the T-shirt reads:

---

[1] Greg testified that he did not discuss the ownership of the car in the television interviews, but acknowledged that people generally have a tendency to assume he is the owner.

4

Greg Andrews
Big Nasty
First in the Fours
Wynne, AR

5.      Photographs of the Race Car were introduced into evidence. Defendants'
Exhibit #2 and Plaintiffs' Exhibit #9 are both photographs of the Race Car that show the
passenger side window.  In these photographs, it is apparent that the Race Car has the
words "Greg Andrews" on the passenger side window.  Defendants' Exhibit #1 is an
older photograph of the Race Car, taken before it was detailed and painted yellow; it
shows the driver side window. At that unknown prior date, the Race Car had the words
"Andrews Brothers" in the driver side window.  There is no evidence before the Court as
to whether the driver side window still has those words.

6.      The uncontroverted testimony was that the Race Car cannot be legally
driven on public roads and therefore, no title to it exists.  Additionally, the evidence was
that the Race Car was never listed on any personal property assessment.

7.      Greg worked at the Andrews Auto Body (the **"Body Shop"**), located in
Wynne, Arkansas, and owned by Greg's brother, Brian Andrews, for many years before
leaving in 2007.  Steve Wallin, whom the Court found to be particularly credible,
testified that Greg left the Body Shop as a result of a falling out with Brian.  Tony Sides
corroborated Mr. Wallin's testimony about the falling out and stated that the
disagreement resulted in a physical altercation between the two brothers.  Mr. Wallin
further testified that after the falling out, Greg took possession of the Race Car and it was
Mr. Wallin's impression that the Race Car belonged to Greg after that.  The other

5

witnesses' testimony did not contradict Mr. Wallin's testimony, except as to the *ownership* of the Race Car following the Andrews brothers' falling out. While the other witnesses generally corroborated Mr. Wallin's testimony regarding *possession* of the Race Car after the falling out, they contradicted his testimony regarding *ownership* of the Race Car.

8.      After leaving the Body Shop at some unknown date in 2007, Greg and Randy Watson formed A&W Extreme Painting, LLC (the **"LLC"**).

9.      Mr. Watson testified that Greg said he owned the Race Car.

10.     Greg and Mr. Watson both testified that Greg received money from Mr. Watson and that the money was used, as intended by both, for various expenses related to the Race Car. There was contradictory testimony as to whether Mr. Watson transferred the money to Greg as a gift or a loan.

11.     Mr. Watson had a bus that was painted to match the Race Car. (Defendants' Exhibit #3.)

12.     Both Greg and Mr. Watson testified that the LLC was dissolved in 2008 after Greg and Mr. Watson had financial disagreements.

13.     On September 2, 2008, Randy and Renee Watson sent a demand letter to Greg requesting he pay them $17,906.62 that he had borrowed from them, and return to them a golf cart and nitrous pumping station. These items are the same items that the Watsons identified in the Complaint, and that the Debtors ultimately listed in the Second Amended Petition.

14.     The Debtors stated on their original Statement of Financial Affairs that Greg made $8,000 income from self-employment during the year 2008.  The Second Amended Petition, which discloses the Transfers, does not change the statement that Greg was self-employed and earned $8,000 in 2008.

15.     Ronda, Brian, and Greg testified that Brian had been the exclusive owner of the Race Car until recently, when another Andrews brother, Jeff, also acquired an interest in it.  Brian further testified that Jeff acquired a 25% interest in the Race Car.

16.     The Debtors lived in Wynne until around the time they filed the Petition. While the precise location of each Debtor's residence in early 2009 is unclear, Ronda testified that on February 12, 2009, Greg lived with Jeff in Searcy, Arkansas and she lived with her mother.  She also testified that on February 19, 2009, both Debtors resided at a rented house in Searcy, Arkansas. This house appears in photographs submitted into evidence as Plaintiffs' Exhibits #6 & #7. Debtors still resided at this address on the date of the Trial.

17.     The Debtors purchased a Four Winds Hurricane RV (the **"RV"**) in September 2008 on a balloon note.  Five months later, on January 23, 2009, the Debtors obtained refinancing of this note from the same bank.  (Plaintiffs' Exhibit #5.)  The refinancing application requests a $20,050 loan. The loan application states that the loan is a consumer loan, not a business loan.  Debtors stated on the loan application that they had a monthly income of $5,500.

7

18.     In January 2009, when the Debtors refinanced the RV and completed the refinancing application, Greg was unemployed and Ronda was on medical leave from her job.  Ronda testified that the income stated on the refinancing application was the Debtors' anticipated income.  Ronda explained that she anticipated returning to work, and that Greg planned to begin working for his brother Jeff at Jeff Andrews Trucking.

19.     Greg began working at Jeff Andrews Trucking in early February 2009, shortly before the Debtors filed the Petition.  He worked there as an employee, driving dump trucks.  On Schedule I of the Petition, the Debtors listed $3,336.67 in net monthly income, all from Greg's employment.  The Petition indicated that Ronda was on medical leave and had no income.

20.     On Schedule C (Exempt Property) of the Petition, the Debtors listed the RV as exempt and noted that it was "for business."  Ronda Andrews testified that the RV was purchased with the idea that Greg would use it to live in Searcy while working for his brother Jeff, because the Debtors were still residing in Wynne at the time of the RV purchase.  However, the Debtors moved to Searcy on February 18, 2009, approximately two weeks after Greg started working at Jeff Andrews Trucking.  Furthermore, there was testimony that Greg was living at Jeff's home in Searcy prior to the Debtors' move on February 18, 2009.

21.     The Debtors attempted to sell the RV after the Petition was filed in this case.  Greg testified that the asking price for the RV was the amount due on the loan.  Debtors did not seek permission from the Court to sell the RV.

22.     The Race Car was listed for sale shortly before Trial.  Tony Sides testified that Jeff instructed him to list the Race Car for sale.  The list price was $33,000.  The Debtors did not seek permission from the Court to sell the Race Car. Prior to the Trial, the Debtors did not disclose the Race Car's existence.

23.     On the day of the Trial, the Race Car and a trailer alleged to be owned by Brian Andrews were both stored at the Debtors' home in Searcy.  Plaintiffs' Exhibit #7 is a photograph, taken on an unknown date, showing the utility trailer stored in the Debtors' attached garage.  Neither the Race car nor the trailer was listed on Debtors' schedules and statement of financial affairs in any of their bankruptcy petitions.

24.     In the Second Amended Petition, filed on the eve of Trial and on the same day that the Creditors served subpoenas on the witnesses to be called at Trial, the Debtors added those possessions and transfers that were alleged in the Complaint,[2] except that they did not add the Race Car (Complaint ¶8) or the utility trailer (Complaint ¶4). Debtors allege that they do not own either of these items, each testifying that the Race Car belongs to Brian and Jeff, their utility trailer was destroyed by a tornado, and the utility trailer currently in their possession belongs to Brian.

---

[2] The Debtors did not add possessions and transfers exactly as alleged in the Complaint. For example, the Complaint alleges that the Debtors possess a number of items, such as the Motorcycle, that are listed in the Second Amended Petition as past transfers rather than current possessions. However, the Second Amended Petition does respond to the allegations pertinent to each material possession and transfer except the Race Car and the utility trailer.

25.     The Court did not find Greg or Brian's testimony credible.  The Court finds that Greg held an ownership interest in the Race Car.

26.     The Second Amended Petition states that a 1995 Harley-Davidson (the **"Motorcycle"**) was traded in June 2008.  However, Greg testified that he got the loan to buy the Motorcycle in June 2008 and kept the Motorcycle for a few months before he traded it.  He also stated that the 4-wheeler he received in exchange for the motorcycle was the same one that the Second Amended Petition states he sold to another one of his brothers, Marcus Andrews, in June 2008.

27.     After prompting from his attorney, Greg testified that the transfers not disclosed prior to the Second Amended Petition were sales made in the ordinary course of business.  The Court finds that the Transfers added to the Second Amended Petition were not sales of property made in the ordinary course of business.

28.     The parties agreed at the beginning of the Trial that the Petition and the First Amended Petition were incorrect.

29.     The Debtors testified at the Trial that the items that were not disclosed in the Petition were left off through inadvertence and without intent.

## APPLICABLE LAW

The bankruptcy system depends upon the cooperation and honesty of voluntary debtors.  *Mertz v. Rott (In re Mertz)*, 955 F.2d 596, 598 (8th Cir. 1992), *citing In re Mascolo*, 505 F.2d 274, 278 (1st Cir. 1974).  To encourage full disclosure by debtors, the

Bankruptcy Code provides harsh penalties for debtors' failure to be fully forthcoming.

Section 727(a) provides, in relevant part, that a debtor shall be denied a discharge if:

> (2)  the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>> (A) property of the debtor, within one year before the date of the filing of the petition; or
>> (B) property of the estate, after the date of the filing of the petition;
>
> . . .
>
> (4) the debtor knowingly and fraudulently, in or in connection with the case, –
>> (A)  made a false oath or account;
>> . . .

Because the Court finds that the Debtors' discharge must be denied based on the Debtors' false oaths, it will analyze only the law and facts relevant to § 727(a)(4)(A).

The party objecting to discharge bears the burden of proof.  Federal Rule of Bankruptcy Procedure 4005.  The Creditors have the burden of showing, by a preponderance of the evidence, that the Debtors made a false oath in the Petition, their statements at the meeting of creditors, or subsequent amendments to the Petition. However, once the party objecting on § 727(a)(4) grounds has shown that a false oath was made, the burden shifts to the debtors to show that there was no false oath made or that the oath was made without the requisite fraudulent intent.  *See, e.g., In re Mascolo*, 505 F.2d 274, 276 (1st Cir. 1974) ("once it reasonably appears that the oath is false, the burden falls upon the [debtor] to come forward with evidence that he has not committed the offense charged."), cited with approval in *Mertz v. Rott*, *supra*; *In re Ward*, 82 B.R.

11

484, 486 (Bankr. E.D. Ark. 1988) (when the movant proves that "debtor committed any of the prohibited acts, debtor then has the burden of coming forward with evidence to explain his conduct.").

Debtors sign their bankruptcy petitions (including the schedules and statement of financial affairs) under oath. Similarly, debtors' statements at the § 341 meeting of creditors are made under oath. In this case, the Debtors filed three signed petitions – the original petition and two subsequent amendments – and made statements under oath at the meeting of creditors. The Creditors have shown, and the Debtors have admitted, that there were omissions and incorrect statements made in the original Petition, the amended schedules and statements of financial affairs, and at the meeting of creditors. Additionally, as explained herein, the Creditors have proven other omissions and inaccuracies on the original Petition as well as both amendments to the Petition. Accordingly, false oaths were made, and the burden has shifted to the Debtors to explain those omissions and errors, and to prove that such omissions and errors were not made knowingly and fraudulently.

## ANALYSIS

Having reviewed the record *de novo*, and having corrected those facts the Court initially misunderstood, the Court continues to find that the Debtors did not intend to fully disclose their assets and their finances on their schedules and statement of financial affairs. Most importantly, the Debtors completely failed to disclose their control of and ownership interest in the Race Car. They both denied ownership during the Trial, even

12

though the Race Car is consistently identified as belonging to Greg Andrews, treated as property of Greg Andrews, and is an integral part of their lives.  Further, the other inconsistencies on their Petition, schedules and statement of affairs show a disregard for accuracy and complete disclosure.  Finally, the timing of the amendments and disclosures the Debtors ultimately made in response to the Plaintiffs' Complaint show a complete disregard for providing the Court, the Trustee or their creditors with correct information.  These facts belie the Debtors' claims of ignorance and innocence with respect to their false oaths.  The Court therefore concludes that the Debtors knowingly and fraudulently made false oaths and should be denied a discharge.

### A.  <u>Control and Ownership of the Race Car</u>

The Race Car, worth $33,000 and apparently not subject to any lien, was Greg's abiding passion and an asset with which the Debtors could have paid their creditors.  Despite Debtors' uncontroverted testimony that they did not possess the Race Car on the day of filing, and that his brother Brian actually owned the Race Car at that time, the manifest weight of the evidence leads to the Court's conclusion that Greg not only controlled the Race Car, but had an ownership interest in it.[3]

Since Greg and his brother Brian built the Race Car approximately 20 years ago, Greg has driven it, raced it at public events, appeared in television interviews with it, represented it belonged to him, worked on it, maintained it, named it, stored it, painted

_____

[3] For purposes of this opinion, the Court does not need to establish whether that interest is a 100% ownership interest or a partial ownership interest.

extensive detailed designs on it, and held himself out as its owner to both the Creditors and the general public.  Greg even sold T-shirts with his name appearing above the picture of the Race Car, and his name and the name of the Race Car on the back. In sum, Greg treated the Race Car as his own, possessed it before and after his bankruptcy filing, and exercised control over it as if it were his own.  Question 14 on the Statement of Financial Affairs required the Debtors to list any property that the Debtors "hold or control." In both the Debtors' original Petition and the two subsequent amendments, Debtors failed to disclose any interest in the Race Car.  Because the Court finds that Greg controlled the Race Car and did not disclose this control, the Court concludes that the information stated in the Petition was false and that the Debtors knew it was false when they signed it, when they made sworn statements at the meeting of creditors, when they filed the First Amended Petition, and when they filed the Second Amended Petition.

Furthermore, the Court finds that Greg Andrews not only controlled the Race Car, but held an ownership interest in it.  The Court acknowledges that the testimony of Brian, Greg and Ronda that Brian owned the Race Car but merely allowed Greg to drive it *could* lead to the conclusion that while Greg controlled the Race Car, he did not own it, were it not for one very decisive fact.  When Greg and Brian parted ways, and Greg left Brian's shop, Greg took possession of the Race Car.  It is impossible to believe that after a hostile parting, that Brian – the "then" alleged owner of the Race Car – would allow his brother Greg to take the car if Greg had no ownership interest in it.  Given all the evidence, the Court finds that Greg held an ownership interest in the Race Car, and he and Ronda made

14

an intentional false oath by not listing it on their schedules.  Although this finding alone is sufficient to warrant a denial of Debtors' discharge, there are other indicia of the Debtors' dishonest intent that merit discussion, as described below.

### B.  Greg Andrews' Undisclosed Transfers Or Undisclosed Income

The Court finds that Greg made numerous undisclosed transfers within two years of filing bankruptcy.  These transfers were ultimately disclosed on the Second Amended Petition but claimed at Trial to have been transfers in the ordinary course of business that resulted in the $8,000 in self-employment income listed for 2008.  Specifically, the Debtors originally reported on their Statement of Financial Affairs ("**SOFA**"), Question 1 that Greg made $8,000 income from self-employment during the year 2008,  but made no transfers of property other than those made in the ordinary course of business or financial affairs of the debtor (see response to SOFA, Question 10).  The Debtors amended their Schedules and SOFA on May 14, 2009, but did not change their answers to Questions 1 or 10.  On October 23, 2009, after service of and response to the Plaintiffs' Complaint, the Debtors filed the Second Amended Petition.  The Second Amended Petition still reports the $8,000 in self-employment income for 2008 but adds a number of transfers of items detailed in the Complaint, including a Motorcycle and a 4-wheeler.  (See list of items added to the SOFA, Question 10, listed on page 2 of this Opinion).

Debtors' counsel argued at Trial that the addition of the transfers to the Second Amended Petition was an error made in an abundance of caution.  Counsel argued that the transfers disclosed on the Second Amended Petition were actually made in the

15

ordinary course of Greg's business and that the profit from these transfers constitutes part of the $8,000 self-employment income disclosed for 2008.   Greg testified that he has bought and sold things to make money on the side all his life, including things like the Motorcycle, an enclosed trailer, and scrap metal, which were sold in 2008. Greg's testimony, that the $8,000 reported on his SOFA for 2008 included these amounts from selling on the side, was unconvincing.   Rather, the Court finds that this $8,000 represents Greg's income from the LLC. Accordingly, the transfers listed in the Second Amended Petition were initially undisclosed and only disclosed on the eve of Trial.   Alternatively, if such transfers were made in the ordinary course of business, as Debtors contend, the Debtors failed to disclose the income resulting from such transfers.   Based on the evidence and Greg's lack of credibility, the Court finds that the Debtors intentionally failed to disclose these transfers (or if such transfers were in the ordinary course of business, failed to disclose the income resulting from such transfers).

### C.   The RV

The Debtors' inexplicable claim that their RV was held for business purposes and their failure to separately value the RV and a Pontiac Grand Prix on their schedules provides additional evidence of their intent to provide false information on their schedules and statement of financial affairs.

In their original Petition, the Debtors cited 11 U.S.C. § 522(d)(2) as the basis for the exemption of the RV and a 2000 Pontiac Grand Prix.   As this section clearly states that it is applicable to only one motor vehicle, this exemption is without any basis.

16

Debtors' Second Amended Petition lists the RV as exempt under 11 U.S.C. § 522(d)(5) (the "wildcard" exemption), which could be an applicable exemption.  However, Debtors persist in stating that the RV was held for business purposes.  Why they do so is difficult to understand because whether it was held for business purposes is irrelevant to the availability of the § 522(d)(5) exemption, and not supported by the facts.

Nevertheless, the Debtors' assertion that the RV is for business purposes with no facts to support such assertion is relevant to the Debtors' intent to be completely honest. The Debtors first purchased the RV in September 2009, five months before Greg began working for his brother's trucking business.  They refinanced it a month before Greg began working there. The application for the refinancing loan describes it as a consumer loan, not a business loan.  Greg works at Jeff Andrews Trucking as an employee, not as an owner or capital investor.  He drives a dump truck for the business.  Ronda Andrews testified that they purchased the RV so that Greg could live in Searcy while working there, but she also testified that he lived with his brother when he started his employment at the business and shortly thereafter began living in a house in Searcy.  No testimony indicated that Greg had ever used the RV as part of his performance of job duties at Jeff Andrews Trucking.  Furthermore, although Greg is still employed at Jeff Andrews Trucking, he has nonetheless attempted to sell the RV.  The evidence failed to provide any plausible explanation to support the Debtors' claim that the *recreational vehicle* was purchased or used for a business purpose even though in *three* sets of schedules and

17

despite changing the statute under which the RV was claimed exempt, the Debtors continued to label the RV as "for business."

It is also unusual in that the RV is listed together with Ronda's car, so that "2000 Pontiac Grand Prix & 2000 Four Winds Hurricane RV (for business)" appears as one item on the Debtors' Schedule C, with an exemption claimed in the amount of $2,400 on property with an alleged value of $22,500.  These items are similarly listed together as though they were one item in Schedule B and Schedule D.  The Second Amended Petition does not separate these two items and state an individual value for each.[4]  Nor have the Debtors provided any explanation to the Court for why these two vehicles, which are presumably separately titled and independently transferable, should be treated as one item.

The unusual and baseless pairing of the RV with another vehicle suggests that something is amiss.  It is not clear what advantage the Debtors hoped to gain by categorizing the RV as a business-related item or by treating it and another vehicle as one single item.  The Court notes that the Creditors have filed an objection to exemptions that is not now before the Court, and therefore, it is inappropriate to delve more extensively into the RV issue.  However, in considering the Debtors' intent, it is relevant that the petitions filed in this case falsely state that the RV was held for "business purposes" and

---

[4] The loan application submitted as Plaintiff's Exhibit 5, which the Debtors signed less than a month before filing bankruptcy, states that the value of the RV as $20,000 and Ronda Andrews' car as $5,000.  This fact raises a question, how the two vehicles lost $2,500 in value during less than a month, which neither party has addressed.

fail to provide separate valuations for the RV and the 2000 Pontiac Grand Prix despite the Debtors having amended their schedules twice.

### D.    Other Inaccuracies on Schedules

Other seemingly small mistakes in the Debtors' schedules indicate that the Debtors' did not intend to make a full and honest disclosure of their financial affairs.  For example, the Second Amended Petition states that both the motorcycle and the 4-wheeler were transferred in June 2008.  However, Greg testified that he got a loan in June 2008 to purchase the Motorcycle, *then held the Motorcycle for a few months*, traded it for the 4-wheeler, and sold the 4-wheeler to his brother, Marcus.  If this is true, the Second Amended Petition is false when it states that the Motorcycle and the 4-wheeler were transferred in June 2008.  This is precisely the sort of mistake that courts frequently overlook as inadvertent error; exact recollection of minor transfers made two years ago may be difficult for debtors, and this Court recognizes the difficulty.  However, Greg's testimony makes it clear that while he remembers facts sufficient to reason that these items were <u>not</u> transferred in June 2008, he failed to sufficiently study the Second Amended Petition to discover this inconsistency (indicating a selective memory).  Taken alone, this would still be easily attributed to inadvertence or mere oversight rather than fraudulent intent or knowingly making a false oath.  However, given the circumstances in this case, it corroborates the general impression created by the facts in this case, that the Debtors did not intend to make a full and honest disclosure of their financial affairs; consequently, they did not bother to examine or correct minor inaccuracies.

E.     **Timing of Petition Amendments**

Even assuming, *arguendo*, that the Debtors did not know, when they signed the Petition, that they were not disclosing all the required information, it is difficult to believe that they did not soon realize their error.   The Debtors were able to understand the bankruptcy process well enough to disclose their tax refund and claim it as exempt in May 2009.   They were served with the Complaint in this matter in June 2009, yet failed to amend the Petition until a few days before Trial.   No adequate explanation has been provided to justify this delay of approximately four months.

The most likely explanation, supported by the evidence in this case, is that the Debtors were aware, by no later than June 2009 (and in all probability months before), that their bankruptcy petitions were incomplete and inaccurate.   They were aware that these false statements could result in a denial of discharge, as sought by the Complaint and fully set forth in the oath that must be made by debtors.   The Debtors filed the Second Amended Petition a few days before the Trial, after it became clear to them that the Court would be viewing evidence about the material allegations in the Complaint – allegations that they had originally denied wholly in their Answer.   However, even at that point, Debtors would not disclose to the Court anything about which they did not believe evidence would be presented at Trial.   Furthermore, they continued to deny that Greg Andrews had an ownership interest in and possession or control of the Race Car, failed to accurately list transfers, failed to accurately list personal property, continued to state that the RV was for business purposes, and failed to testify truthfully.   Based on the Debtors'

20

suspect timing of what little they did disclose, the Court finds the Debtors continued to mislead their creditors, the Trustee, and this Court by failing to amend their petition and schedules when they were made aware of the mistakes in them.

## CONCLUSION

To allow this case to proceed to discharge would harm the integrity of the bankruptcy system which depends so heavily on the voluntary and forthright honesty of Debtors. The Debtors have failed to make the thorough and thoughtful disclosure on which the bankruptcy system depends. The Debtors clearly knew, at the time of their initial filing and subsequent amendments, of material facts not disclosed in the original Petition and subsequent amendments. Most significantly, the Debtors never admitted or disclosed their interest in the Race Car, a valuable unencumbered asset. The Debtors failed to disclose significant transfers of property (or the resulting income from such transfers), inaccurately listed their RV as a business-related asset, failed to separately value the RV and a Pontiac Grand Prix, and failed to correct other mistakes on their schedules. Finally, the Debtors last minute disclosures filed on the eve of Trial belie their contention that the mistakes on their original Petition and First Amended Petition were simply innocent omissions and errors.

In sum, to allow a discharge to these Debtors would be an invitation to future debtors to withhold as much information as possible for as long as possible. For these reasons, the Court finds that the Debtors willfully and fraudulently failed to complete the Petition and amendments thereto fully and truthfully. The Debtors are accordingly

21

denied a discharge pursuant to 11 U.S.C. § 727(a)(4), and the Court will enter a separate

Amended Judgment to this effect.

Audrey R. Evans
United States Bankruptcy Judge
Dated:   05/06/2010

cc:      Attorney for plaintiffs

         Attorney for defendants

         Trustee                                    EOD  5/6/2010
                                                    by D Tafoya
         Debtors

         U.S. Trustee

22